IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 8, 2020

**MARIO BATEMAN a/k/a MARIO WOODS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 05-01008      James M. Lammey, Jr., Judge**

_____

**No. W2019-01388-CCA-R3-ECN**

_____

In 2007, a Shelby County jury convicted the Petitioner, Mario Bateman a/k/a Mario Woods, of first-degree premeditated murder and sentenced him to life in prison. This court affirmed the conviction. *State v. Mario Bateman a/k/a Mario Woods*, No. W2007-00571-CCA-R3-CD, 2008 WL 4756675, at *1 (Tenn. Crim. App., at Jackson, Oct. 28, 2008), *perm. app. denied* (Tenn. Mar. 23, 2009). The Petitioner then unsuccessfully filed, in turn, a petition for post-conviction relief, a writ of *error coram nobis*, and a federal habeas corpus petition. He then filed a petition for a writ of *error coram nobis* at issue in this case, alleging that he had newly discovered evidence in the form of an affidavit from the victim's father asserting that the victim was "violent, aggressive, and a bully." He contended that he may have been convicted of a lesser-included offense had the jury heard this testimony and asked that the lower court toll the statute of limitations. The lower court summarily dismissed the petition for a writ of *error coram nobis*, finding that the Petitioner could have discovered the evidence sooner, that the evidence was cumulative to the evidence presented at trial, and that the Petitioner had not shown that the evidence might have affected the outcome of the trial. The Petitioner filed this appeal. After review, we affirm the lower court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Mario Bateman a/k/a Mario Woods, Tiptonville, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. Facts and Background

This case arises from the Petitioner's conviction of the premeditated first-degree murder of Cornelius Muhahmed, a crime for which he received a sentence of life in prison. *Bateman*, 2008 WL 4756675, at *1. In our opinion on the Petitioner's direct appeal of his conviction and sentence we summarized the facts, which we condense here, as follows:

> Michael Watkins testified that he knew the victim, Cornelius Muhahmed, for approximately three or four months before the victim was shot and killed by the [Petitioner]. According to Mr. Watkins, he hung out with the victim at least three or four times a week. On the day of the shooting, Mr. Watkins and the victim were sitting in Mr. Watkins'[s] car in the driveway of an abandoned house at 907 Pope in Memphis, Tennessee. Mr. Watkins stated that he had his head down and was doing a crossword puzzle when he heard a loud bang. The victim yelled, "Oh, shit." After that, Mr. Watkins heard another voice that said, "Bitch, you thought this shit was over with," followed by more shots. Mr. Watkins stated that the shooting occurred at around 6:00 or 7:00 p.m. and it was dark outside. He and the victim had been sitting in the car a couple of hours before the shooting. Mr. Watkins was in the driver's seat and the victim was in the passenger seat.

> Mr. Watkins testified that he identified the voice he heard as belonging to the [Petitioner]. He stated that he was friendly with the [Petitioner]. When the shooting occurred, Mr. Watkins looked up and saw an arm coming through the car's sunroof with a revolver. According to Mr. Watkins, the victim stumbled out of the car after the first shot. The [Petitioner] fired additional shots at the victim. Mr. Watkins exited the car and walked around to see to the victim but the victim was gone. Mr. Watkins left the scene with a friend who pulled up in his car soon after the shooting. He stated that he was scared and just wanted to see his children. . . . Mr. Watkins stated that the [Petitioner's] street name was "Cigarette."

> Mr. Watkins testified that . . . he received a phone call from Chameka Duckett who told him that the police wanted him to bring the car back. Mr. Watkins returned to the scene in his car approximately thirty minutes later. His car was processed for evidence. Mr. Watkins was taken downtown and asked to make a statement to detectives in the Homicide

Department. Mr. Watkins stated that there was no blood or bullet holes in his car. Mr. Watkins told police that the voice he heard sounded like the [Petitioner's]. Mr. Watkins identified the [Petitioner] from a photographic array of possible suspects.

On cross-examination, Mr. Watkins testified that he never saw the [Petitioner's] face, but he recognized the [Petitioner] from behind as he ran down Pope Street. He further identified the clothing the [Petitioner] wore as black jeans and a sweatshirt with a hood. Mr. Watkins stated that when he saw the [Petitioner] earlier that evening, he was wearing black jeans, a black shirt and a black leather jacket. . . .

Chameka Duckett testified that she knew both the victim and the [Petitioner] from the neighborhood. She stated that she also knew Mr. Watkins, and had "hung out" with Mr. Watkins and the victim on the day of the shooting. She recalled seeing the two men in Mr. Watkins'[s] car in the driveway of the abandoned house next door to her house. According to Ms. Duckett, a third man named York, whom she referred to as a neighborhood crack addict, was in the backseat of the car with the two other men. She was taking a bath when she heard gunshots outside her window. Ms. Duckett continued her bath for another twenty minutes after hearing the gunshots. When she saw the blue lights from police cars, she got out of the bathtub, put on her clothes, and went outside to see what had happened. Police officers came to her house and asked if she knew of Mr. Watkins'[s] location. She called Mr. Watkins on his cell phone and told him that the police wanted him to return his car to the scene.

Ms. Duckett also testified that she was at a store on Pope Street approximately one month before the shooting when she saw the [Petitioner] getting up off the ground after an altercation with the victim. She stated that she went downtown to the Homicide Department and made a statement to Sergeant Woodard the day after the shooting. She identified a photograph of the [Petitioner] from a photographic array of possible suspects she was shown. Ms. Duckett also told police that York was present in Mr. Watkins'[s] car at the time of the shooting. Ms. Duckett stated that York died before trial.

Abraham Smith testified that on December 3, 2004, he lived on Kippley Street and had just exited his car in his driveway when he heard a gunshot. He walked around to the rear of his car when he saw the victim beating on the side door of his house. He called out to the victim. The

3

victim came over to Mr. Smith and told him he had been shot and told him to call 9-1-1. According to Mr. Smith, the victim's legs began to get weak. Mr. Smith stayed with the victim who kept repeating, "I don't want to die . . . Hurry and call the ambulance." The victim fell to the ground. Mr. Smith kept asking the victim who shot him, but the victim did not respond. Officer Warren arrived and asked the victim who shot him. Officer Warren instructed Mr. Smith to move away from the victim. Mr. Smith did not hear the victim's response to the officer's question.

. . . .

Ralph Avery testified that he was a firefighter/paramedic with the Memphis Fire Department. He recalled that he responded to a call at a house on Kippley Street at approximately 7:00 p.m. on December 3, 2004. He and his partner encountered the victim lying on the street with a pulse and eye movement. Mr. Avery observed two gunshot wounds to the victim's chest. Mr. Avery asked the victim about his injuries but got no response. Mr. Avery noted that the victim was . . . close to death.

Officer Michael Warren testified that on December 3, 2004, he was a patrol officer with the central precinct when he responded to a "possible shooting with one down" on Kippley Street. He arrived at the scene and found the victim lying on the ground. Officer Warren immediately ran over to the victim and began talking to him. He asked the victim who shot him. The victim responded "Mario Woods." He asked the victim for the shooter's street name and the victim told him "Cigarette." Officer Warren stated that he knew that the [Petitioner] went by the street name Cigarette. Officer Warren did not know where the victim had been shot and did not see any blood. The victim threw up and then began losing consciousness. Officer Warren continued to try to talk to the victim who had closed his eyes and was breathing very slowly. Officer Warren remained at the scene after paramedics transported the victim.

. . . .

Officer Bonzell Bibbs testified that he was a Patrol Officer with the Memphis Police Department in December of 2004 when he responded to a call on Kippley Street. After Officer Bibbs heard the victim tell Officer Warren that an individual named "Mario Woods" shot him, he went over to Pope Street where the shooting occurred. As he searched Pope Street for signs of a crime scene, a woman came running up to him and said,

4

"Cigarette shot him—Cigarette shot him." Officer Bibbs knew Cigarette's given name and identified him as the [Petitioner].

. . . .

William Woodard testified that he was a Sergeant in the Homicide Bureau with the Memphis Police Department on December 3, 2004. Further, he was assigned to investigate the shooting of the victim by the [Petitioner]. He stated that the shooting occurred between 6:00 and 7:00 p.m., and the felony response team was dispatched to cover the scene before his arrival at 10:00 p.m. . . . Sergeant Woodard spoke with Mr. Watkins and Ms. Duckett at the scene and later took statements from them downtown. Sergeant Woodard learned that the victim had identified the [Petitioner] as both Cigarette and as Mario Woods. Sergeant Woodard asked both Mr. Watkins and Ms. Duckett to identify the [Petitioner] from photographic arrays of numbered but unnamed suspects to make sure that his investigation was focused on the correct individual. He stated that the [Petitioner] used at least three different names.

Sergeant Woodard testified that . . . [t]he murder weapon was never recovered.

. . . .

Dr. Kenneth Snell testified that . . . the gunshot wounds likely caused the victim's death. . . .

Vanessa Luellen testified that on the day of the shooting, she saw the victim coming out of the neighborhood store on Pope Street with Michael Watkins. Later that day, she called the victim back to her house just to make sure he was all right. Ms. Luellen stated she had started doing this ever since the [Petitioner] threatened the victim. She stated that she had come to know the [Petitioner] through others in the neighborhood. She knew the [Petitioner] as Mario Woods, Mario Bateman, and Cigarette. According to Ms. Luellen, the victim hit the [Petitioner] in an altercation at the neighborhood store on Pope Street. Ms. Luellen said that the [Petitioner] was angry with the victim and described their relationship as strained.

Ms. Luellen testified that she saw the [Petitioner] just before Thanksgiving. At that time, the [Petitioner] told her, "I'm going to blow

5

your cousin's ass off. I ain't forgot." Ms. Luellen also overheard another remark by the [Petitioner] while he was hanging out in the lot next door to her house. Some neighborhood men were teasing the [Petitioner] about getting hit by the victim. The [Petitioner] responded, "I'm going to blow that motherf\* \*ker's ass off." She stated that after he made this comment, she confronted the [Petitioner] and told him that the victim had a family who would not just sit by and let him do something to the victim. Ms. Luellen also stated that a little while later, she saw the [Petitioner] and the victim sitting outside her house, drinking and smoking marijuana together. When she asked what was going on, the [Petitioner] informed her that they had worked out their differences.

Ms. Luellen testified that after she heard that the victim had been shot, she ran to the scene of the shooting but was unable to see the victim. Later that night, she was able to view the victim's body at the hospital. She spoke with police and gave a statement about the prior altercation between the [Petitioner] and the victim. Ms. Luellen identified the [Petitioner] from a photographic array provided to her by police.

. . . .

Sherhonda Coleman testified that she knew the victim as her boyfriend and had dated him for about two-and-half months before he was shot and killed on December 3, 2004. She stated that she also knew the [Petitioner], who was her mother's boyfriend. She had known the [Petitioner] for approximately three years. According to Ms. Coleman, a conflict arose between the [Petitioner] and the victim when Ms. Coleman brought the victim home to her mother's house. The [Petitioner] told the victim to be quiet and later told him that he was not supposed to be in the house. Ms. Coleman recalled that on a separate occasion, she went with her mother to the [Petitioner's] father's house to visit the [Petitioner] after a fight between the [Petitioner] and the victim. She saw that the [Petitioner] was bleeding and had injuries to his face. Ms. Coleman continued to see the [Petitioner] at her mother's house, and he told her at one point, "I'm going to kill that n\* \*ger for hitting me." She stated that the victim maintained his distance after the fight, and appeared to be afraid of the [Petitioner]. Ms. Coleman said that she also feared the [Petitioner] because of fights she witnessed between him and her mother. Ms. Coleman learned of the victim's death when her mother picked her up from work on the night of the shooting. She did not speak to the [Petitioner] again until after he was incarcerated. She recalled that the [Petitioner] apologized to her for

6

what had happened and wished her luck with her new baby.

On cross-examination, Ms. Coleman testified that she saw the wound on the [Petitioner's] head after his fight with the victim. She stated that the [Petitioner] had to have stitches. She stated that she did not see the [Petitioner] and the victim together again at any time after the fight.

The [Petitioner] was convicted of first degree murder and sentenced to life imprisonment. . . .

*Bateman*, 2008 WL 4756675, at *1-6. The Petitioner appealed his conviction contending that the trial court erred when it (1) admitted into evidence the victim's dying declarations in violation of the Petitioner's Sixth Amendment right to confrontation, (2) permitted the prosecution to inquire into a witness's prior felony convictions on direct examination, and (3) allowed a witness, on redirect examination, to read into evidence the witness's entire statement that the witness had previously given to the police. This court affirmed his conviction.

The Petitioner then filed a petition for post-conviction relief. *Mario Bateman v. State*, No. W2011-01178-CCA-R3-PC, 2012 WL 2866009, at *1 (Tenn. Crim. App., at Jackson, July 12, 2012), *perm. app. denied* (Tenn. Nov. 21, 2012). During those proceedings, the Petitioner's trial counsel testified that the Petitioner wanted the defense theory to be that he did not commit the crimes, but in trial counsel's opinion, the better course was to present a voluntary manslaughter defense. *Id.* He noted the history of animosity between the Petitioner and the victim, including a recent incident that required the Petitioner to get stitches. *Id.* He said he and the Petitioner "came to loggerheads" over the Petitioner's proposed defense. *Id.* This court held that the Petitioner had not proven that he was entitled to post-conviction relief. *Id.*

The Petitioner then filed a petition for a writ of *error coram nobis* in which he contended that trial counsel failed to have a mental evaluation performed on him to determine his competency.[1] The trial court denied the petition, and the Petitioner appealed. He later voluntarily dismissed his appeal.

The Petitioner then filed the petition for a writ of *error coram nobis* at issue in this case, eleven years after his conviction. In it, he contended that there was "newly discovered evidence" in the form of a statement by the victim's father regarding a prior altercation the victim had with the Petitioner. The victim's father said that the victim was "violent, aggressive, and was bullying and threatening the life of the Petitioner." The

---

[1] The grounds for the first writ of *error coram nobis* are taken as articulated by the Petitioner in his second petition for a writ of *error coram nobis*.

victim's father said that he believed that the Petitioner had shot and killed the victim in self-defense. The Petitioner offered an affidavit of the victim's father. The Petitioner contended that, had the jury heard this testimony, the Petitioner would have been convicted of a lesser-included offense.

The State filed a motion to dismiss the Petitioner's petition for a writ of *error coram nobis*. The State contended that the petition did not meet the necessary requirements because the substance of the information at issue was known to the Petitioner and presented at trial. The State contended that the Petitioner had further failed to demonstrate that, had the testimony at issue been presented, the results of his trial may have been different.

The trial court reviewed the petition and the State's motion to dismiss, and it agree with the State. The trial court found:

> Upon review of the [P]etitioner's pleading, including the attached affidavit of [the victim's father], the arguments of the State and the trial record, this court finds, even if newly discovered, the evidence as outlined in [P]etitioner's pleadings is merely cumulative to other evidence in the record. The purpose of the writ is to bring to the court's attention some fact that was, even in the exercise of due diligence, previously unknown. . . . To be considered "newly discovered," the evidence must have been unknown to the defendant at the time of the proceedings giving rise to his conviction. . . . Here, the evidence relates to an incident which was fully described by the witnesses at trial, the prior altercation between the victim and the defendant in which the victim beat the [Petitioner]. It further relates to prior potentially criminal conduct of the victim, a fact that, if not known, could have easily been discovered by [the] [Petitioner] prior to trial.

> . . . . This court determines that [the Petitioner's] petition fails to establish he was without fault in discovering the information at issue; fails to establish the information was unknown to him or is anything more than cumulative to evidence presented at trial; and fails to establish, even if presented at trial, that i[t] may have affected the jury's verdict or the outcome of his trial. Therefore, the court determines the [petition] should be dismissed and grants the State's motion.

(citations omitted). It is from this judgment that the Petitioner now appeals.

## II. Analysis

8

On appeal, the Petitioner contends that the trial court erred when it dismissed his petition for a writ of *error coram nobis*. He asserts that the affidavit from the victim's father contains evidence that is "newly" discovered and that the outcome of his trial would have been different had the jury heard the evidence. The State counters that neither the victim's father's affidavit nor the Petitioner's father's affidavit are contained in the record and, as such, the Petitioner has waived this issue. In his reply brief, the Petitioner contends that the trial court's order indicates that it reviewed these affidavits and that the Petitioner has made all possible attempts to ensure the affidavits' inclusion in the record.

It is well-established that the writ of *error coram nobis* "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). The decision to grant or to deny a petition for the writ of *error coram nobis* on its merits rests within the sound discretion of the trial court. *Ricky Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). We, therefore, review for abuse of discretion. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which are litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

A petition for a writ of *error coram nobis* "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief. *Bernardo Lane v. State*, No. W2008-02504-CCA-R3-CO, 2009 WL 4789887, at *5 (Tenn. Crim. App., at Jackson, Dec. 11, 2009), *perm. app. denied* (Tenn. June 17, 2010) (citations omitted). "As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record . . . will not justify the granting of a petition for the writ of *error coram nobis* when the evidence, if introduced," might not have resulted in a different outcome. *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted); *see also Vasques*, 221 S.W.3d at 525-28 (noting that proper standard of review is whether the proffered evidence "might have" resulted in a different outcome rather than whether it "would have" resulted in a different one).

The State is correct that the affidavits are not included in the record, which would

normally result in waiver of the issue. The Petitioner, however, is correct that the trial court's order indicates that it reviewed the affidavits, and there is an order in the record from this court directing the trial court to submit the affidavits. Therefore, it would not be equitable to the Petitioner to waive the issue. This still, however, does not result in the Petitioner receiving the relief he seeks.

Even if this court were to take as true the Petitioner's recount of the "newly" discovered evidence, we conclude that his petition still fails. First, the evidence does not constitute newly discovered evidence. In order to qualify as newly discovered evidence, "the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible." *Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018) (citations omitted). In addition, the *coram nobis* petition must show why the newly discovered evidence "could not have been discovered in a more timely manner with the exercise of reasonable diligence" and how the newly discovered evidence, had it been admitted at trial, "may have resulted in a different judgment." *Id.*

The Petitioner has not offered an explanation about why the evidence could not have been discovered in a timelier manner with the exercise of reasonable diligence. The Petitioner's father's affidavit, which described the injuries from the fight that occurred before the shooting, was clearly discoverable in a timelier fashion. Arguably, the victim's father's assertions that the victim was a violent bully was also discoverable. It simply should not have taken the Petitioner eleven years to find and offer this evidence. Further, we agree with the trial court that the evidence is cumulative to that presented at trial. Multiple witnesses described the altercation between the victim and the Petitioner. The Petitioner knew the extent of this altercation and the extent of his injuries. The Petitioner chose to present a defense based upon mistaken identity and did not want to present a defense based upon the victim being aggressive or violent or a bully. Counsel encouraged the Petitioner to offer a defense based upon voluntary manslaughter, and the Petitioner refused. Under those circumstances, evidence that the victim was aggressive or a bully would not have aided the Petitioner's defense. After review, we conclude that the trial court did not abuse its discretion when it held that the Petitioner was not entitled to *coram nobis* relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the trial court properly denied the Petitioner's petition for a writ of *error coram nobis*. In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE